682 A.2d 350

**Bradley G. SMALL, Appellant,**

v.

**JUNIATA COLLEGE, Dr. Robert Neff, President, Arnold Tilden, Vice-President, William Berrier, Athletic Director, Toby A. Dick, Chester Darlington and Joseph K. Kimmel, Appellees.**

Superior Court of Pennsylvania.

Argued June 13, 1996.

Filed Aug. 6, 1996.

412

James L. Cowden, Harrisburg, for appellant.

Mark A. Fontana, Harrisburg, for appellees.

Before TAMILIA and JOHNSON, JJ., and MONTEMURO, Judge.*

TAMILIA, Judge:

Bradley Small appeals from the July 20, 1995 Order granting the motion for summary judgment filed on behalf of all appellees in this employment dispute. As enunciated by the trial court, the facts of this case are as follows.

Plaintiff, Dr. Bradley G. Small, was employed by Juniata College from 1983 until his discharge on February 24, 1992. Dr. Small's duties at the college were in the athletic depart-

---

* Retired Justice assigned to the Superior Court.

ment and in this regard he served Juniata as head football coach from April, 1989, until his dismissal. In 1983, the initial year of employment, the offer to work for the college for the period of one year was tendered to Dr. Small in a letter from the then President Dr. Frederick M. Binder. Dr. Small indicated his acceptance of the terms of the offer by signing and returning a duplicate of the letter of offer. Each year thereafter, Dr. Small was invited to renew his relationship with Juniata for another year in the same fashion. The college President would extend an offer by letter; Dr. Small would accept by signing and returning a copy.

After an unsuccessful football campaign in 1991, 17 players met for the purpose of verbalizing their dissatisfaction with Coach Small. The dissidents memorialized their complaints about Coach Small in a letter to Vice–President Arnold Tilden dated February 3, 1992. Mr. Tilden and Athletic Director William Berrier responded to the students by investigating their complaints. Random interviews of past and present players were conducted by Dean Tilden and Mr. Berrier. None of the signers of the February 3rd letter were interviewed. On February 18, 1992, Tilden and Berrier met with Coach Small and shared with him their findings. The substance of this meeting was set forth in a letter tendered to Dr. Small that same day in which terms and conditions were spelled out for employment during the 1992–93 academic year. Although there is substantial dispute as to the length of time afforded Dr. Small to respond to Vice–President Tilden's letter, there is no dispute that President Robert W. Neff wrote to the plaintiff on February 24, 1992, informing him that since he had not responded to the terms of future employment dictated by Vice–President Tilden, his employment would not be continued beyond June 30, 1992. Further, plaintiff was directed to vacate his office within forty-eight (48) hours, and advised that he would not be permitted to fulfill other duties during the remainder of the 1991–92 academic year. [Thereafter, the college paid appellant and continued his benefits, pursuant to his one

year contract, for the remainder of the 1991–92 academic year.]

This action was commenced against not only the college and the administrators directly involved in plaintiff's dismissal, but also against three of Coach Small's players who unquestionably were linchpins in the group of players that fomented the letter to Vice–President Tilden on February 3, 1992.

(Slip Op., Kurtz, J., 7/20/95, pp. 2–3.)

The causes of action advanced by appellant below were breach of contract, intentional interference with employment relations and intentional infliction of emotional distress. By Order dated July 20, 1995, summary judgment was granted as to all three claims and this appeal followed.

■ A grant of summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions of record and affidavits on file support the trial court's conclusions that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035; *see also Atkinson v. Haug*, 424 Pa.Super. 406, 409–11, 622 A.2d 983, 985 (1993). We will overturn a trial court's entry of summary judgment only if there has been an error of law or a clear abuse of discretion. *McCain v. Pennbank*, 379 Pa.Super. 313, 317–18, 549 A.2d 1311, 1313 (1988).

As to the breach of contract claim, appellant claims, "the lower court, having found the existence of a written employment contract, erred in finding as a matter of law that 'just cause for termination' and conflict resolution provisions of a personnel manual were not incorporated into the employment contract." (Appellant's brief at 10.) We reject this claim.

■ Initially, we agree with appellant and the trial court that appellant had a contractual relationship for employment, and thus we reject the appellees' claim that appellant's employment was at-will. We find that the annual letters offering employment between 1983 and 1992, which appellant was to sign and return to the college President, constituted one-year

employment contracts. However, we reject appellant's contention that a personnel manual submitted to all employees, which contained sections discussing termination "for cause" and conflict resolution procedures, somehow transformed these consecutive one-year contracts into permanent employment.

As noted by the trial court, our resolution of this issue is guided by the decision in *Ruzicki v. Catholic Cemeteries Association,* 416 Pa.Super. 37, 610 A.2d 495 (1992). In *Ruzicki,* an employee at-will challenged his termination on the basis that an employee handbook conferred upon him the right to certain disciplinary proceedings before he could be terminated. In affirming the trial court's grant of summary judgment in favor of the appellee/employer, our Court held as follows:

'A handbook is enforceable against an employer if a reasonable person in the employee's position would interpret its provisions as evidencing the employer's intent to supplant the at-will rule.' The handbook, moreover, must contain a clear indication that the employer intended to overcome the at-will presumption. We have held that it is for the court to interpret the handbook to discern whether it contains evidence of the employer's intention to be legally bound.

*Id.* at 42, 610 A.2d at 497 (citations omitted).

In support of its conclusion, the *Ruzicki* court also relied on *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 511 A.2d 830 (1986), in which a newspaper editor was fired for running an advertisement in a competing newspaper. The editor challenged the dismissal on the basis that her conduct was not an act specified in the employee handbook as warranting disciplinary action. Thus, like Ruzicki, Martin claimed that the handbook converted her at-will employment into employment that could be terminated only for good cause. We again disagreed, reasoning as follows:

Appellant had been hired as an at-will employee. To now hold that the handbook allowed her discharge only for just

cause would, in effect, convert her into an employee with a contract for an indefinite term who could be fired only for a just cause. This would be a modification of immense proportions. For such an extreme modification of a pre-existing contract, we would require a clear statement of an intent to so modify. We do not believe a reasonable person in the appellant's position would have read this handbook provision as converting her from an at-will employee to an employee with an indefinite contract who could never be discharged without objective just cause. We reiterate that there was already a contract between the appellant and the newspaper, the terms of which were that appellant could be discharged for any or no reason. In the handbook, we fail to see the definiteness required to overcome that original at-will contract.

*Id.* at 215–16, 511 A.2d at 838 (citations omitted).

Appellant attempts to distinguish *Ruzicki* and *Martin* on the basis that "in this case Dr. Small is not an at-will employee, and the question is whether the Administrative Personnel Manual which the college expected Dr. Small to abide by was, in fact, a part of his written employment contract." (Appellant's brief at 18.) We reject appellant's claim that the at-will status of the plaintiffs in *Ruzicki* and *Martin* renders those cases inapplicable to our analysis. The point of *Ruzicki* and *Martin* is that in order for the courts to allow an employee handbook to work "an extreme modification of a pre-existing contract, we would require a clear statement of an intent to so modify." *Martin, supra* at 215, 511 A.2d at 838. The only plausible construction of this holding is that it should apply in all cases where an employee argues that a handbook operates to work an extreme modification of his or her existing contractual status. As in *Martin,* our review of the instant handbook, which was not referenced by any of appellant's one-year employment contracts, indicates that it does not contain a "clear statement of an intent to so modify" those one-year contracts. In fact, our review has not revealed a single statement, nor does appellant direct our attention to one, indicating that the "just cause" and conflict resolution

provisions urged by appellant were intended by the college to contradict the terms of appellant's annual employment contracts. We are simply unable to conclude that a reasonable person in appellant's position would have read the handbook provisions at issue as converting his annual contracts into permanent employment terminable only for just cause. *Martin, supra.* Thus, we find that the provisions of the handbook upon which appellant relies did not become terms of his employment. In light of this finding, it becomes apparent that at the end of the 1991–92 academic year, for which appellant was fully compensated, the college merely declined to renew its employment relationship with appellant and such was its right. As there was no contract to breach, appellant's first claim fails.

Appellant next claims "the lower court erred in concluding as a matter of law that the player-defendants did not intentionally interfere with Dr. Small's employment contract[.]" (Appellant's brief at 18.) In order to successfully advance a cause of action for intentional interference with contractual relations, appellant must demonstrate the following: (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct. *Triffin v. Janssen,* 426 Pa.Super. 57, 62–64, 626 A.2d 571, 574 (1993), *alloc. denied,* 536 Pa. 646, 639 A.2d 32 (1994). In analyzing such a claim, our Courts have traditionally applied section 767 of the Restatement (Second) of Torts [1] which provides as follows:

### 767. Factors in Determining Whether Interference is Improper

[1]. See for example *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978), *cert. denied,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895 (1971); *Triffin v. Janssen,* 426 Pa.Super. 57, 62–64, 626 A.2d 571, 574 (1993), *alloc. denied,* 536 Pa. 646, 639 A.2d 32 (1994); *Allied Security, Inc. v. Security Unlimited, Inc.,* 265 Pa.Super. 297, 401 A.2d 1219 (1979).

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) *the relations between the parties.*

Further, comment (b) to section 767 provides:

The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

*Id.*

 In rejecting appellant's claim below, the trial court held as follows:

We believe strongly that the 'rules of the game' in the academic world encourage students to voice their opinions even when those opinions are wrong or premised on untruths, half-truths or the unverified hearsay testimony of other persons. It would be a sad day if this Court burdened college students with the possibility of tort liability for expressing their thoughts, including those motivated by pride, resentment and anger on any subject related to

college life. In making this judgment, we assume that administrators and faculty are mature and wise enough to separate the wheat from the chaff.

(Slip Op. at 13.) We agree with the trial court that the student concerns involved herein, as expressed to college administrators under the facts of this case, do not constitute intentional interference with a contractual relationship within the meaning of section 767. Of course, this holding does not carve out a new exception to a recognized tort. Rather, we simply recognize that, under the facts of this case, student criticism of a college employee with whom the students must interact, when expressed to the administration, does not constitute intentional interference with an employment relationship. Hence, we find that the trial court was correct in concluding as a matter of law that the student-appellees had not engaged in improper conduct and that appellant had failed to set forth a prima facie cause of action for intentional interference with contractual relations. *See Triffin, supra* (summary judgment appropriate where appellant fails to set forth a prima facie cause of action for intentional interference with contractual relations.).

■ Finally, appellant claims the lower court erred by concluding that the player/appellees were entitled to judgment as a matter of law on the count of intentional infliction of emotional distress.[2] Initially, we note that a panel of our Court has held that the tort of intentional infliction of emotional distress is not recognized in Pennsylvania. *Ford v. Isdaner,* 374 Pa.Super. 40, 44–45, 542 A.2d 137, 139 (1988), *alloc. denied,* 520 Pa. 617, 554 A.2d 509 (1988). However, it appears that the *Ford* holding is the subject of some confusion and conflict in our law. *See Johnson v. Caparelli,* 425 Pa.Super. 404, 625 A.2d 668 (1993). Like the *Johnson* court, rather than contributing to this conflict and confusion, we find that, regardless of the current state of this tort in Pennsylvania, appellant has failed to establish its requisite elements. *Id.*

**2.** At argument before the trial court, appellant conceded that no claim of intentional infliction of emotional distress was available against the college/appellees. (Slip Op., Kurtz, J., 7/20/95, p. 14.)

Section 46 of the Restatement (Second) of Torts, provides as follows:

**§ 46 Outrageous Conduct Causing Severe Emotional Distress**

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it for such bodily harm.

In defining the outrageous conduct requirement, our Court has held:

Liability has been found only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Jones v. Nissenbaum, Rudolph and Seidner,* 244 Pa.Super. 377, 383, 368 A.2d 770, 773 (1976) (emphasis in original). Finally, as appellant concedes, a court must make the initial determination of whether a defendant's conduct was so extreme and outrageous that recovery may be justified. *See Reimer v. Tien,* 356 Pa.Super. 192, 198–200, 514 A.2d 566, 569 (1986); and Restatement (Second) of Torts, § 46, Comment (h) (1965) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.").

▪ We have no difficulty in concluding that the conduct of the player/appellees herein, in expressing concerns about their football coach to the college administration, was not so extreme and outrageous that it went beyond "all possible bounds of decency and [was] utterly intolerable in a civilized community." *Jones, supra.* Thus, the trial court properly granted summary judgment in favor of appellees on this claim.

Based on the foregoing, we agree with the trial court that appellant has failed to set forth prima facie causes of action for breach of contract, intentional interference with an employment relationship and intentional infliction of severe emotional distress. We affirm the July 20, 1995 Order granting summary judgment.

Order affirmed.